SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
ANGELA C. C. VIRAMONTES (No. 228228)
Deputy Federal Public Defender
(E-mail: Angela_Viramontes@fd.org)
3801 University Avenue, Suite 150
Riverside, California 92501
Telephone (951) 276-6346
Facsimile (951) 276-6368

Attorneys for Defendant
NATHAN RAMON WELLS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. ED CR 10-06-VAP |
| Plaintiff, | NATHAN RAMON WELLS' POSITION RE: SENTENCING FACTORS; EXHIBITS |
| v. | |
| NATHAN RAMON WELLS, | |
| Defendant. | Hearing Date: October 25, 2010 |
| | Hearing Time: 9:00 a.m. |

## TABLE OF CONTNENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE GUIDELINE CALCULATION . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      18 U.S.C. § 3553(a) Is The Applicable Standard Of Review . . . . . . . . . . . . 2

      A.    Mr. Wells' Pattern Of Delinquent Behavior Is A Result Of The
            Emotional Neglect And Abuse He Suffered, As Well As His Father's
            And Neighborhood's Influence . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    Mr. Wells Suffered From Neglect, Emotional Abuse, And
                  Physical Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    Mr. Wells Academic Struggles Resulted From His Emotional
                  Distress And Possibly An Undiagnosed Learning Disability . . . 8

            3.    Mr. Wells' Father And Neighborhood Influenced Mr. Wells'
                  Deviant Behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    The Nature and Circumstances Of The Offense Show Mr. Wells
            Lacked Foresight Into The Consequences Of His Actions . . . . . . . . . 11

      C.    A Lengthy Sentence of Incarceration Would Not Reflect The
            Seriousness Of Mr. Wells' Offense, Promote Respect For The Law,
            Provide Just Punishment, Or Deter Mr. Wells From Committing
            Future Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    A Split Sentence Of Nine Months In Custody Followed By Nine
                  Months At A Community Corrections Center Reflect The
                  Seriousness of Mr. Wells' Offense . . . . . . . . . . . . . . . . . 11

            2.    Mr. Wells Has Shown Respect For The Law . . . . . . . . . . . . . 12

            3.    A Split Sentence Of Nine Months In Custody Followed By Nine
                  Months At A Community Corrections Center Is Just Punishment
                  In Light Of The Punishments Mr. Wells Will Suffer From After
                  His Sentence Ends In This Case . . . . . . . . . . . . . . . . . . . 12

            4.    A Lengthy Sentence Of Incarceration Will Not Deter Mr. Wells
                  From Reoffending . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      D.    Mr. Wells Is Not A Threat To The Public . . . . . . . . . . . . . . . . . . 15

      E.    A Split Sentence Of Nine Months Incarceration Followed By Nine
            Months At A Community Corrections Center Is the Appropriate
            Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Gall v. United States,*
128 S. Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

*Kimbrough v. United States,*
128 S. Ct. 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Nelson v. United States,*
129 S. Ct. 890 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6

*Rita v. United States,*
127 S. Ct. 2456 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5

*Spears v. United States,*
129 S. Ct. 840 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Booker,*
125 S. Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5

*United States v. Booker,*
543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Zavala,*
443 F.3d 1165 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

## FEDERAL STATUTES

18 U.S.C. § 32(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4

18 U.S.C. § 3582(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## OTHER CITATIONS

Michael Tonry, Purposes and Functions of Sentencing,
34 Crime & Just. 1, 28-29 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

1 | SEAN K. KENNEDY (No. 145632)
Federal Public Defender
2 | (E-mail: Sean_Kennedy@fd.org)
ANGELA C. C. VIRAMONTES (No. 228228)
3 | Deputy Federal Public Defender
(E-mail: Angela_Viramontes@fd.org)
4 | 3801 University Avenue, Suite 150
Riverside, California 92501
5 | Telephone (951) 276-6346
Facsimile (951) 276-6368
6 |
Attorneys for Defendant
7 | NATHAN RAMON WELLS

8

9

10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | NO. ED CR 10-06-VAP |
|---|---|---|
| Plaintiff, | ) | NATHAN RAMON WELLS' POSITION RE: SENTENCING FACTORS; EXHIBITS |
| v. | ) | |
| NATHAN RAMON WELLS, | ) | |
| Defendant. | ) | Hearing Date: October 25, 2010 |
| | ) | Hearing Time: 9:00 a.m. |

## I.    INTRODUCTION

Mr. Nathan Wells is a 19 year old young man who never received the guidance and support that all children need and crave from their parents. Mr. Wells childhood was characterized by domestic violence; divorce; competition for parental attention between a large number of siblings, half-siblings, and step-siblings; and child abuse. Caught between an abusive father and neglectful mother Mr. Wells adopted the deviant behavior he saw in his family and neighborhood.

Mr. Wells pled guilty to Interference with an Operator of an Aircraft in violation of 18 U.S.C. § 32(a)(5) on August 2, 2010. The United States Probation Office, in its Presentence Report ("PSR"), recommends that the Court sentence Mr.

1  Wells to a term of imprisonment of 24 months followed by a three-year term of

2  supervised release.  The government recommends a sentence of 18 months of

3  imprisonment.  A sentence of nine months in the custody of the Bureau of Prisons

4  followed by nine months at a Community Corrections Center, however, is the

5  reasonable sentence under 18 U.S.C. § 32(a)(5) given that Mr. Wells is 19 years old,

6  his dysfunctional and abusive childhood, and the seriousness of this offense.

7  **II.**   **THE GUIDELINE CALCULATION**

8       The Presentence Investigation Report ("PSR") calculates a Guideline range of

9  24 to 30 months based on a Total Offense Level of 18 and Criminal History Category

10 III.  Mr. Wells does not dispute the PSR's Guideline calculation.

11 **III.**   **DISCUSSION**

12      **18 U.S.C. § 3553(a) Is The Applicable Standard Of Review**

13      The Court is not bound by the Guidelines.  Rather, the Court must consider the

14 guidelines, along with other factors of equal weight, to arrive at a reasonable

15 sentence.  See 18 U.S.C. § 3553(a).

16      The Supreme Court has ruled that the mandatory nature of the Federal

17 Sentencing Guidelines violates the Sixth Amendment.  United States v. Booker, 125

18 S. Ct. 738 (2005).  Consequently, the Sentencing Guidelines are "effectively

19 advisory" now.  Id.  Furthermore, over the last five years, the Supreme Court has

20 consistently held that federal judges should impose sentences that are not greater than

21 necessary to satisfy the statutory purposes of sentencing, consider *all* of the

22 characteristics of the offender and circumstances of the offense, *reject* advisory

23 guidelines that are not based on national sentencing data and empirical research, and

24 serve their function in the constructive evolution of responsible guidelines.  See

25 United States v. Booker, 543 U.S. 220 (2005); Rita v. United States, 127 S. Ct. 2456

26 (2007); Gall v. United States, 128 S. Ct. 586 (2007); Kimbrough v. United States,

27 128 S. Ct. 558 (2007); Spears v. United States, 129 S. Ct. 840 (Jan. 21, 2009); Nelson

28 v. United States, 129 S. Ct. 890 (Jan. 26, 2009).

The applicable sentencing statutes provide that a sentencing court "shall impose a sentence sufficient, but not greater than necessary" to achieve the objectives of sentencing. See 18 U.S.C. §§ 3553(a), 3582(a), and 3661. In arriving at the appropriate sentence, § 3553(a) directs sentencing courts to consider: (1) the nature and circumstances of the offense, (2) the history and characteristics of the offender, (3) the need to impose a punishment that reflects the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, (4) to afford adequate deterrence, (5) to protect the public from further crimes, (6) to provide the defendant with needed education, vocational training, medical care or other correctional treatment[1], and (7) the kinds of sentences that are available. 18 U.S.C. § 3553(a)(1), (2).

Under the previously mandatory Guideline scheme, sentencing courts were prohibited from considering a host of factors, including the defendant's mental and emotional state. See U.S.S.G. § 5H1.3.[2] 18 U.S.C. § 3661, however, provides that "no limitation shall be placed on the information concerning the background, character, and conduct of the person . . . which a court . . . may consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

In addition, the guideline range cannot be considered to embody the presumptively reasonable sentence. United States v. Zavala, 443 F.3d 1165 (9th Cir.

---

[1]   Section 3553(a)(2)(D) requires a sentencing court to evaluate the need to provide the defendant with education, training, treatment or medical care in the most effective manner. This directive might conflict with the guidelines, which in most cases offer only prison. See U.S.S.G. § 5C1.1 (describing limited circumstances in which court can impose sentence other than imprisonment). Finally, in some cases the guidelines will clash with § 3553(a)'s primary directive: to "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing. Id.

[2]   Courts were also forbidden to consider other factors, such as the defendant's age, U.S.S.G. § 5H1.1, his education and vocational skills, § 5H1.2, physical condition, U.S.S.G. § 5H1.4., his employment record, § 5H1.5, his family ties and responsibilities, § 5H1.6, his socio-economic status, § 5H1.10, his civic and military contributions, § 5H1.11, and his lack of guidance as a youth, § 5H1.12. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. Id.

3

2006) (per curiam).  If a district court:

> "makes the Guideline calculation *the* presumptive sentence, it will commit legal error by misapplying § 3553(a), which now makes the Guideline a, but only a, factor to be considered.  It will fail to embrace the discretion that it has, which is to reach the right answer to the sentencing decision rather than a merely plausible answer."

Zavala, 443 F.3d at 1170 (emphasis in original).  Accordingly, the guideline calculation is simply one factor to be considered in the sentencing mix and "[n]othing in 18 U.S.C. § 3553, as it stands after Booker, indicates that the Guidelines are to be given any greater weight than their fellow sentencing factors."  Id., at 1171.

The Supreme Court's decision in Rita v. United States, 127 S. Ct. 2456 (2007) did not change the Court's mandate to impose a sentence in accordance with 18 U.S.C. § 3553(a) and does not permit the Court to place a presumption of reasonableness on a Guidelines sentence.[3]  In particular, the Court in Rita specifically stated that whatever presumption of reasonableness may apply to an appellate court reviewing a Guidelines sentence, "the sentencing court does not enjoy the benefit of a legal presumption that a Guidelines sentence should apply."  Id., at 2465.

The Supreme Court again recently rejected the notion that a Guideline sentence is presumptively reasonable.[4]  In Nelson v. United States, 129 S. Ct. 890 (2009) (per

_____

[3]    Booker and Rita have resulted in an interesting relationship between 18 U.S.C. § 3553(a) and the Guidelines.  Although the Guidelines are ostensibly only one of many equally important factors, it is the only factor which produces a specific sentence.  Litigants, perhaps understandably, gravitate toward its promise of certainty and uniformity.  This results, as George Orwell might have put it, in consideration of the Guidelines as a factor "more equal" than others, despite the explicit rejection of such notion by the Supreme Court.  See Gall v. United States, 128 S. Ct. 586 (2007) (rejecting the assertion that extraordinary circumstances are required to justify a non-guideline sentence and reiterating the holding in Booker that the Guidelines are but one of many factors to be considered).

[4]    Too often in practice, the Guideline range becomes the factor by which reasonableness is tested: the Guideline range is calculated and it is then tested for reasonableness.  Other factors are considered only after the Guidelines have yielded a concrete and specific sentencing range.  Even the term "Booker variance", used to denote a non-Guideline sentence, implies deviation from a norm which should otherwise presumptively apply and confers a priority – at least temporally – to the Guidelines since one can only vary from what is already known.  The government – both in plea negotiations and in Court – almost invariably treat the Guideline calculation as the presumptively reasonable sentence.  One need look no further than

curiam), the Supreme Court – for the second time in the same case and on the same grounds – reversed the Fourth Circuit Court of Appeals's finding that within-Guidelines sentences are presumptively reasonable.  The Supreme Court noted:

> "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.  In *Rita* we said as much, in fairly explicit terms: 'We repeat that the presumption before us in an *appellate* court presumption . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'"

Nelson, 129 S. Ct. 890 at 892 (emphasis in original).

It is clear that after Booker and pursuant to its progeny, the Court must consider 19 year old Mr. Wells' abusive and dysfunctional childhood, as well as his criminal history in imposing a reasonable sentence in this case.  When those factors are fully considered, a split sentence of nine months in custody followed by nine months at a Community Correction Center, emerges as the reasonable sentence in this case.

### A.   Mr. Wells' Pattern Of Delinquent Behavior Is A Result Of The Emotional Neglect And Abuse He Suffered, As Well As His Father's And Neighborhood's Influence

#### 1.   Mr. Wells Suffered From Neglect, Emotional Abuse, And Physical Abuse

Mr. Wells "experienced a significant degree of emotional neglect and emotional and physical abuse in his familial environment, which was characterized by domestic conflict between his parents, separation and divorce, geographical displacements, competition for parental attention between a large number of siblings . . . and a consistent pattern of physical abuse from his father."  Ex. C, Psychological Evaluation, Dr. Marc Sanders, 09/16/10, p. 6.

Mr. Wells was born on January 27, 1991, to his teenage 17 year old mother, Sonya Garza, and his adult 24 year old father, Randall Wells.  Ex. A, Certificate of

its Fast Track program to acknowledge this truth.

Live Birth for Nathan Ramon Wells, 02/11/1991. Mr. Nathan Wells was Ms. Garza's and Mr. Randall Wells' second child. Ex. B, Letter to the Honorable Virginia A. Phillips from Sonya Garza, 09/16/10, p. 1.

For the first eight years of Mr. Wells' life, he lived with his parents and three siblings in Cathedral City, California. Ex. C, p. 2. Mr. Wells recalls that his parents frequently argued and "the household was 'very stressful'" whenever they fought. Id. To make matters worse, Mr. Wells' father was verbally and physically abusive with Ms. Garza. Ex. B, p. 1.

When Mr. Wells was approximately eight years old, Ms. Garza discovered that Mr. Wells' father was having an affair. Ex. C, p. 2. Ms. Garza filed for divorce. Id. Out of all of Ms. Garza and Mr. Wells' children, Mr. Wells' took his parents' divorce the hardest. Ex. B, p. 1. Although Mr. Wells believes his "dad was to blame for breaking [the family] up because he had the affair", Mr. Wells to this day denies that he is angry with his father for his actions. Ex. C, p. 2.

Mr. Wells decided to move in with his father and his father's new family, which included his father's girlfriend and her four children. Ex. C, p. 2. Mr. Wells describes this as "the most difficult time in his life because his family was now separated and his father's house was too crowded and uncomfortable." Id. Mr. Wells wanted to live with his father because he "liked being around him", but felt it was "easy to get lost in the shuffle with all of those other kids." Id. Mr. Wells lived with his father for less than a year. Id.

Although Mr. Wells wanted to be with his father, Mr. Wells' father was very abusive. Mr. Wells reported to Dr. Sanders that his father "would 'spank' him with a belt 2-3 times per month, but in a previous interview with Jacob Etner (Investigator at the Federal Public Defender's Office), [Mr. Wells] reported spankings that occurred 3-4 times per week." Ex. C, p. 3. When Dr. Sanders asked Mr. Wells about the kinds of things his father punished him for, Mr. Wells responded, "[b]eing bad in school, being a clown in class . . . my dad would say, if you keep getting in trouble you're

1   going to keep getting whippins." Id.  When Dr. Sanders asked Mr. Wells if his father

2   ever talked to him about what happened or tried to understand why Mr. Wells got into

3   "trouble", Mr. Wells "responded with a blank look on his face and said, 'I knew what I

4   was doing was wrong and I knew what the punishment would be'." Id.  Mr. Wells'

5   response conveyed to Dr. Sanders "the sense that [Mr. Wells] was protecting his father

6   and attempting to take the blame" and "the sense that communications with [Mr.

7   Wells'] father lacked emotional understanding and physical punishments were likely

8   excessive and abusive." Id.  Mr. Wells' response is not surprising given that he is 19

9   years old and "it is quite common for victims of childhood abuse to block out

10  memories of traumatizing events and to have very little insight into what happened to

11  them until later in adulthood when they begin to reflect on their past experiences." Id.

12  at p. 6.

13       Although Mr. Wells' mother did not physically abuse him, she did not protect

14  Mr. Wells from his father's abuse and routinely neglected Mr. Wells.  Mr. Wells'

15  mother prioritized her relationships with boyfriends over him.  For example, one time

16  when Mr. Wells' mother was out on a date, Mr. Wells called his mother because his

17  brother injured himself. Id.  Mr. Wells' mother did not answer her phone, which

18  angered Mr. Wells and led to him vandalizing his mother's boyfriend's car. Id.  As

19  Mr. Wells explains "I didn't want her being around other guys . . . some other man

20  coming in and trying to take my place." Id.  Thus, Mr. Wells "hungered for her

21  attention and felt deeply conflicted about having to share her with others, especially

22  other men." Id.

23       Mr. Wells also felt that he had to compete with his siblings for his mother and

24  father's attention.  Mr. Wells felt that his older brother Randall received more

25  attention and gifts from their father. Ex. C, p. 3.  Mr. Wells' competition with his

26  brother led to many fights between the two and as Mr. Wells explained, "[t]hat's where

27  I got a lot of anger out for a long time, was at my brother." Id.

28       Thus, as a "result of this emotionally deprived and abusive familial

7

environment" Mr. Wells developed "a profound lack of emotional security, which is critical for the development of a firm sense of self-esteem and self-worth. In particular, the consistent physical punishments he received from his father were likely worse than he stated in the interview and were most likely traumatic." Ex. C, p. 6. Consequently, Mr. Wells "was sorely unprepared to manage the intense feelings of loss, neglect, and rage that he experienced growing up." Id. .

## 2.   Mr. Wells Academic Struggles Resulted From His Emotional Distress And Possibly An Undiagnosed Learning Disability

Given the abuse and neglect Mr. Wells experienced at home, it is not surprising that he struggled academically for years and eventually dropped out of school.

Starting in kindergarten, Mr. Wells' teachers warned Mr. Wells' parents that Mr. Wells was not performing at grade level. In kindergarten, Mr. Wells' teacher informed Mr. Wells' mother at each parent-teacher conference that Mr. Wells' needed additional help. Ex. D, Report Card for Nathan Wells, Academic Year 1996-1997. Mr. Well's continued to perform below grade level in first, second, third, fourth, and fifth grades. Ex. E, Report Cards for Nathan Wells, Academic Years 1997-2002. When Mr. Wells was in third grade and eighth grade, Mr. Wells' mother received notice that Mr. Wells was at risk for retention. Ex. F, Intervention Conference Summaries, Grades 3 and 8. Despite these warnings, Mr. Wells' parents took no action. Consequently, by the ninth grade Mr. Wells was enrolled in an alternative education program and continued to struggle until he dropped out of school. Ex. C, p. 5. Despite Mr. Wells' consistent poor performance and warnings from teachers, Mr. Wells never received tutoring or special education services.

When asked about his difficulties in school, Mr. Wells reported that he "always had a hard time concentrating and staying focused, especially when reading." Ex. C, p. 5. Mr. Wells stated, "I would get side-tracked and start thinking about something else," and "I would end up being the class clown." Id.

Mr. Wells' problems in school stem from his emotional distress and may also be

8

1  connected to an undiagnosed learning disability and/or attention disorder. <u>See</u> Ex. C,

2  p. 7. Mr. Wells "identified his difficulties with concentration and focus in [his

3  interview with Dr. Sanders] and commented on his embarrassment about revealing

4  these troubles to anyone." <u>Id.</u> Thus, "[t]he school setting would also be an extremely

5  unrewarding environment to be in and only act to reinforce [Mr. Wells'] feelings of

6  incompetence and low self-esteem." <u>Id.</u>

7          **3.    Mr. Wells' Father And Neighborhood Influenced Mr. Wells'**

8                  **Deviant Behavior**

9          Mr. Wells grew up in a neighborhood close to the "Dream Homes"

10  neighborhood "which is known to have a high incidence of criminal activity and a

11  significant gang presence." Ex. C, p. 4. Mr. Wells' father and uncle "grew up in [a]

12  gang culture" and "had a 'crew they ran with' for many years." <u>Id.</u> Not surprising,

13  Mr. Wells recalls the police arresting his father for receiving stolen property, evading

14  arrest, burglary, and drug possession. <u>Id.</u> To this day, Mr. Wells and his brother "get

15  respect on the street because everyone knows the name of his father and uncle." <u>Id.</u>

16  Mr. Wells "seems to take pride in the fact that his father was well known in the area."

17  <u>Id.</u>

18          Thus, Mr. Wells' "lifestyle is very much embedded in this environment, which

19  provides social rewards for deviant behavior." Ex. C, p. 4. For example, when Dr.

20  Sanders asked Mr. Wells why he has been in so much legal trouble Mr. Wells

21  responded, "'[w]hen I was younger, it was fun'" and went on to describe the first time

22  he watched his older brother steal a car stereo. <u>Id.</u> Mr. Wells stated, "[a]t first I was

23  scared, but then I got used to it and it became like a competition with my friends to see

24  who could get the most stuff by the end of the night . . . everybody did it". <u>Id.</u>

25          At the same, Mr. Wells "has always been very scared of law enforcement,

26  especially when pursued by police." Ex. C, p. 4. Mr. Wells admits that "he loses

27  control when he is panicked and scared and does things he later regrets." <u>Id.</u>

28  Consequently, when "he is approached or pursued by police he 'panics' and is unable

1   to think about anything else except to escape the situation." Id.  Mr. Wells also
2   believes the local police "have it out for him because of his family name" and often
3   harass him even though he has done nothing wrong. Id.

4        Aside from "having a father, uncle, and an older brother who modeled criminal
5   behavior, it appears that the local neighborhoods also provided an environment that
6   normalized unlawful behavior and provided social rewards for engaging in such
7   behaviors." Id.  In explaining his past arrests and Mr. Wells states "that much of the
8   time [I] was just trying to 'have fun' with friends and 'to be the smoothest'."  For
9   someone like Mr. Wells "who lacked the capacity to regulate his emotions, lacked a
10  sense of identity and self-esteem, and was starving for attention and acceptance, this
11  social environment must have seemed appealing." Id.

12       Due to Mr. Wells' dysfunctional upbringing, "[a] prominent theme threaded
13  throughout Nathan's life is his relationship with his father and his conflicted
14  interactions with male figures in general, especially those in a role of authority." Ex.
15  C, p. 7. Mr. Wells holds his father in high esteem and spends a great deal of time with
16  him. Id.  At the same, Mr. Wells is "unwilling to discuss negative or ambivalent
17  feelings about his father, and instead, tended to offer protective explanations for his
18  father's actions, especially around the issues of physical punishment and criminal
19  behavior." Id.  In doing so, Mr. Wells "is able to preserve an idealized image of him,
20  which offers a sense of internal strength and confidence through identification." Id.
21  Through "identifying with the idealized figure of his father, [Mr. Wells] can achieve
22  an inflated sense of identity and self-worth without having to confront the anxiety of
23  actually lacking his own." Id.  Unfortunately, Mr. Wells' strong identification with his
24  father and his father's behavior is exemplified by shared interests as well as the similar
25  criminal conduct - evading arrest, receiving stolen property, and drug possession. See
26  id.

27       Mr. Wells "pattern of aggressive and rebellious behaviors toward law
28  enforcement officers and the resulting threat of punishment he receives from the legal

10

1  system reflect a nearly perfect symbolic enactment of the panic, helplessness, and
2  anger Mr. Wells may have felt in relation to his father." Ex C, p. 8.  On one hand Mr.
3  Wells "establishes his prideful association with his father by emulating his father's
4  deviant behavior" and on the other he asserts his anger and defiance towards his father
5  by taking it out on others.  See id.  As Dr. Sanders concluded:

> [t]he unfortunate consequence of this unconscious cycle of
> acting-out, which is aimed at protecting a vulnerable and fragile
> sense of self, is that it becomes a self-fulfilling prophecy in
> which Mr. Wells repeats and re-experiences the emotional
> neglect, loneliness, and trauma of his childhood, and perhaps,
> continues a trans-generational pattern of deviant self-defeating
> behavior.

10  Id.

### B.  The Nature and Circumstances Of The Offense Show Mr. Wells Lacked Foresight Into The Consequences Of His Actions

13  On June 3, 2009, Mr. Wells, who was 18 years old at the time, was driving
14  home.  Ex. C, p. 5.  He was bored and had his friend's laser beam pen.  Id.  He started
15  "goofing around" with the pen and flashed it at a helicopter not realizing "the pen's
16  laser could travel the distance to reach the helicopter."  Id.  Thus, he did not flash the
17  laser beam at the helicopter with any ill intent.  Id.  Rather, Mr. Wells' actions and
18  statement show was that he lacked an understanding of what could result from shining
19  the pen at a helicopter.

### C.  A Lengthy Sentence of Incarceration Would Not Reflect The Seriousness Of Mr. Wells' Offense, Promote Respect For The Law, Provide Just Punishment, Or Deter Mr. Wells From Committing Future Crimes

#### 1.  A Split Sentence Of Nine Months In Custody Followed By Nine Months At A Community Corrections Center Reflect The Seriousness of Mr. Wells' Offense

27  While all criminal conduct is a serious matter, Mr. Wells' offense is not among
28  the most serious criminal conduct.  Mr. Wells, at 18 years old, made the spur of the

moment decision to see how far his friend's laser beam pen would travel without thinking through the consequences of his actions.  Ex. C, p. 5.  The pen contained no information or warnings about the strength of the beam.  See Ex. G, Declaration of Ana Hernandez, 10/05/10, ¶ 3.  Plainly, Mr. Wells did not commit a sophisticated crime that involved planning or concealment.  Furthermore, this was an isolated incident that occurred over a matter of minutes.  Although Mr. Wells caused both the pilots to look away while flying a helicopter, the fact remains Mr. Wells did not injure the pilots or anyone else.

### 2.    Mr. Wells Has Shown Respect For The Law

In this case, Mr. Wells cooperated with law enforcement.  Upon apprehension, Mr. Wells immediately handed over the laser beam pen to law enforcement officials.  When questioned by the Federal Bureau of Investigations ("FBI"), Mr. Wells confessed to his wrongdoing.  At no point did he attempt to obstruct justice.  Furthermore, Mr. Wells plead guilty and accepted responsibility for his actions.

While it is true that Mr. Wells has shown a lack of respect for the law, this case has profoundly affected Mr. Wells.  Mr. Wells for the first time is facing a lengthy sentence of incarceration.  As Mr. Wells writes, " I have learned that being an adult I am responsible for my actions and I need to make good choices because the choices I make can affect my life and the lives of others."  Ex. H, Letter to Judge Phillips from Nathan Wells, 09/13/10, p. 1.  Mr. Wells "wishe[s] [he] would have made a better choice and now know[s] how serious [his] crime is."  Id.

### 3.    A Split Sentence Of Nine Months In Custody Followed By Nine Months At A Community Corrections Center Is Just Punishment In Light Of The Punishments Mr. Wells Will Suffer From After His Sentence Ends In This Case

Both the government and Mr. Wells agree that a sentence of 18 months is just punishment for his crime.  Given the circumstances of this crime, nine months in the custody of the Bureau of Prisons followed by nine months in a Community

1    Corrections Center, is the appropriate sentence.

2         Wells does not have a pattern of similar conduct and his conduct in this case

3    lasted for mere minutes.  He cooperated with law enforcement by handing over the

4    laser pen and answering the FBI's questions regarding his offense.  Mr. Wells plead

5    guilty and accepted responsibility for his actions.

6         Mr. Wells also has insight into his misconduct.  As Mr. Wells writes, "I have

7    learned that being an adult I am responsible for my actions and I need to make good

8    choices because the choices I make can affect my life and the lives of others."  Ex. H,

9    p. 1.  Mr. Wells' mother also attests to Mr. Wells' insight into his misconduct and

10   writes that Mr. Wells "blames himself for his actions.  He is grateful that no one was

11   hurt and understands how serious this is."  Ex. B, p. 2.  Mr. Wells' soon-to-be

12   step-father attests as well, "Nathan has taken full responsibility for this incident and

13   has shared his remorse to his mother and I for his disrespect to authority."  Ex. I, Letter

14   to the Honorable Virginia A. Phillips from Don Wynot, p. 1.

15        The Court should also consider the punishments Mr. Wells will face as a result

16   of this conviction, such as restricted employment opportunities.  Mr. Wells will likely

17   face employment discrimination.  A joint study conducted by Georgetown University,

18   University of California - Berkeley, and University of California - Los Angeles,

19   examined the hiring practices of Los Angeles based employers and found that "[o]ver

20   40 percent of the employers indicate[d] that they would 'probably not' or 'definitely

21   not' be willing to hire an applicant with a criminal record."  Ex. J, Harry J. Holzer et

22   al., Employer Demand for Ex Offenders: Recent Evidence from Los Angeles (March

23   2003), p. 7.  The study also found that employer willingness to accept applicants with

24   criminal histories did not increase significantly over the 1990s during the economic

25   boom."  Id.  This finding is especially problematic for Mr. Wells who will attempt to

26   reenter the job market during the worst economic downturn since the Great

27   Depression.  Mr. Wells' job prospects are even more bleak given his lack of education.

28   //

### 4.    A Lengthy Sentence Of Incarceration Will Not Deter Mr. Wells From Reoffending

Recent research proves that social services and a support network will deter Mr. Wells from reoffending, not a lengthy prison sentence.

Three National Academy of Science panels as well as numerous major surveys of deterrence research concluded that "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, <u>Purposes and Functions of Sentencing</u>, 34 Crime & Just. 1, 28-29 (2006).  Rather, "certainty and promptness of punishment are more powerful deterrents than severity." <u>Id</u>. at p. 28.  Thus, a severe lengthy sentence is not likely to deter Mr. Wells from reoffending.

What is likely to deter Mr. Wells from reoffending is access to social services.  Mounting research shows that "anger management, cognitive-skills programs . . . and various educational and vocational skills programs" reduce a defendant's probability of reoffending." <u>Id</u>. at p. 33.  Access to programs like these will help Mr. Wells to succeed when he is released from custody, reducing the likelihood he will commit further crimes.

Furthermore, Mr. Wells is most likely to receive the support he needs for rehabilitation at a Community Corrections Center in his community.  Through the Palm Springs Unified School District Adult School, Mr. Wells can obtain his GED.  <u>See</u> Ex. K, Palm Springs Unified School District, Palm Springs GED Test Preparation Classes, 10/05/2010, p. 1.  Through Riverside County Office of Education, Mr. Wells can participate in educational and vocational skills programs.  <u>See</u> Ex. M, Riverside County Office of Education, Career Technical (CTE) Introduction, 10/5/10, p. 1.  At the College of the Desert in Palm Desert, California, Mr. Wells can obtain certificates in automobile repair.  <u>See</u> Ex. N, College of the Desert, Automotive Technology, 10/05/10, pp. 1-2.

If Mr. Wells is at a Community Correction Center, he can receive support from his sister, mother, and mother's fiancee who all want to see Mr. Wells succeed.  <u>See</u>

1   Ex. B; Ex. I; Ex. L, Letter to Judge Phillips from ——- Wells, p. 1.  After all, at just 19

2   years old, Mr. Wells is still in need of parental guidance and support.

3          Thus, the most effective way to deter Mr. Wells from committing future crimes

4   is to help him develop vocational skills and a positive support network.

5   **D.     Mr. Wells Is Not A Threat To The Public**

6          Mr. Wells does not pose a danger to the community at large or certain types of

7   individuals.  Mr. Wells does not have any prior convictions for crimes of violence.

8   PSR at ¶¶ 31-37.  Nor does Mr. Wells have any convictions for crimes involving

9   fraud.  Id.  Furthermore, there is no reason to believe Mr. Wells poses a threat to the

10  public based on his conviction in this case.

11  **E.     A Split Sentence Of Nine Months Incarceration Followed By Nine**

12  **Months At A Community Corrections Center Is the Appropriate**

13  **Sentence**

14         Mr. Wells is a very young man in need of guidance and support.  As Dr. Sanders

15  writes, "[i]t is extremely unfortunate that the very consequence of [Mr. Wells']

16  acting-out behaviors will serve to prevent him from receiving the therapeutic

17  intervention necessary for his recovery, and will instead, reinforce and perpetuate the

18  very cycle of trauma that motivates his deviant behavior in the first place."  Ex. C, pp.

19  9-10.  A split sentence, however, would allow Mr. Wells to receive psychological

20  counseling at a Community Corrections Center to address his underlying emotional

21  distress and trauma.  Mr. Wells would be able to attend group and individual

22  counseling, as recommended by Dr. Sanders.  Id. at p. 10.  Given that Mr. Wells'

23  longest prior sentence was 90 days in custody, nine months at a Bureau of Prison's

24  facility will have a profound impact on Mr. Wells.  Thus, a split sentence will allow

25  Mr. Wells to obtain the psychological services he needs, as well as punish him for his

26  misconduct.

27  //

28  //

## IV.   <u>CONCLUSION</u>

Although Mr. Wells is a troubled 19 year old, he is capable of change. This sentence is an opportunity for the Court to punish Mr. Wells for his actions and to impose a sentence that will give Mr. Wells access to the social and educational services that he needs so that he can go on to lead a productive life. Thus, Mr. Wells respectfully requests that Court impose a split sentence of nine months in the custody of the Bureau of Prisons followed by nine months at a Community Corrections Center.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  October 5, 2010          By _____
                                 ANGELA C. C. VIRAMONTES
                                 Deputy Federal Public Defender

16

1

## PROOF OF SERVICE

2  I, the undersigned, declare that I am a resident or employed in Riverside

3  County, California; that my business address is the Federal Public Defender's Office,

4  3801 University Avenue, Suite 150; Riverside, California 92501; that I am over the

5  age of eighteen years; that I am not a party to the above-entitled action; that I am

6  employed by the Federal Public Defender for the Central District of California, who

7  is a member of the Bar of the United States District Court for the Central District of

8  California, and at whose direction I served the Nathan Ramon Wells' Position Re:

9  Sentencing Factors; Exhibits.

10  On October 5, 2010, following ordinary business practice, service was:

11  [X]Placed in a closed          [ ] By hand-          [ ] Placed in a sealed
   envelope, for collection and   delivery addressed    envelope for collection and
12  hand-delivery by our internal  as follows:           mailing via United States
   staff, addressed as follows:                         Mail, addressed as follows:

13

14  Charles Pell                              Lori Pascover
   Assistant United States Attorney          United States Probation Officer
15  3880 E. Lemon St., Ste. 210              312 N. Spring St., 6th Floor
   Riverside, California 92501 [ECF]         Los Angeles, CA 90012

16  This proof of service is executed at Riverside, California, on October 5, 2010.

17

18

19  I declare under penalty of perjury that the foregoing is true and correct to the

   best of my knowledge.

20

21

22  Kristina Beck

23

24

25

26

27

28